918 So.2d 274 (2005)
Norris RIGGS, Jr., Petitioner,
v.
STATE of Florida, Respondent.
No. SC05-133.
Supreme Court of Florida.
December 15, 2005.
*276 James Marion Moorman, Public Defender, Bruce P. Taylor, Assistant Public Defender, Tenth Judicial Circuit, Bartow, FL, for Petitioner.
Charles J. Crist, Jr., Attorney General, Tallahassee, FL, Robert J. Krauss, Chief Assistant Attorney General, Bureau Chief, Tampa Criminal Appeals, Marilyn Muir Beccue and Richard M. Fishkin, Assistant Attorney Generals, Tampa, FL, for Respondent.
CANTERO, J.
In this case, we explore some of the parameters of the exigent circumstances exception to the search warrant requirement. Specifically, we consider how the exception applies when authorities find a child wandering alone around an apartment complex. We review State v. Riggs, 890 So.2d 465 (Fla. 2d DCA 2004), which expressly and directly conflicts with Eason v. State, 546 So.2d 57 (Fla. 1st DCA 1989). In both cases, authorities found a young child wandering alone. Fearing that its caretaker might be suffering a medical emergency, they entered a nearby apartment. In both cases, they found marijuana in plain view. In this case, the Second District upheld the warrantless entry as reasonable under the circumstances, whereas in Eason the First District concluded that the police violated the Fourth Amendment. We granted review to resolve the conflict. See art. V, § 3(b)(3), Fla. Const.; Riggs v. State, 900 So.2d 554 (Fla.2005) (granting review). For the reasons explained below, we agree with the Second District that exigent circumstances justified the entry in this case and approve that decision. We disapprove Eason to the extent it conflicts with this opinion.

I. FACTS
In the middle of a January night, two sheriff's deputies were summoned to an apartment complex in Mulberry, Florida. A four-year-old girl had been seen wandering there, naked and alone. When the deputies arrived at about 3 a.m., they found the girl in the company of local residents. She was disoriented and "had no idea where she had wandered out of." The deputies decided to search the complex door by door for her caretakers. As one later testified, they were "concerned about the welfare of the parents [and] obviously we're also concerned about any type of child abandonment or anything like that."
The apartment complex stood three stories high, and contained as many as fifty apartments. Upon reaching the second floor, the deputies noticed that every door on that level appeared closed, except for one. According to one deputy, "that [door] was standing slightly ajar, and it was just obvious that somebody had come out of there or somebody had left it open, and that was possibly where the child had come out of." Through a small opening, the deputies could see light inside the apartment. They pounded loudly on the *277 door at least three dozen times, identifying themselves as police officers. Although some neighbors stepped outside during the commotion, no one inside the apartment responded.
Concerned that "something had happened to the child's caregiver and that maybe there was a medical concern in there," the deputies entered the apartment. Once inside, they continued calling out, again without response. On a coffee table in the living room, they noticed a plastic cigar tube containing some seeds (later determined to be marijuana). They then entered three rooms in succession. The first contained nothing unusual. The second contained seven potted marijuana plants with a fluorescent light suspended above them. In the third was the petitioner Norris Riggs, along with a woman later identified as the girl's babysitter. After his arrest, Riggs confessed to growing the marijuana.
The State charged Riggs with manufacturing cannabis and possessing drug paraphernalia. Riggs pled not guilty and moved to suppress the evidence, claiming it was the fruit of an unreasonable search. At the suppression hearing, the State argued that exigent circumstances justified the warrantless entry. Without making detailed findings of fact, the trial judge followed a First District decision: "So, it appears to me that the court's holding in Eason is based on the lack of exigent circumstances, that the child at that point was safe and there was no exigent circumstances to require them going in there. I'm going to find that Eason controls, and I will grant the motion to suppress all of the evidence."
The facts in Eason were similar. Again a young child was found wandering through an apartment complex. There, the lost boy was younger (two or three years old), and the encounter occurred later in the morning (8 a.m.). Eason, 546 So.2d at 58. The officers followed the boy to a specific apartment, where he pointed to a partially open door and said something to the effect of, "Mommy's in there." Id. Upon knocking and receiving no reply, the officers entered. They found the boy's caretakers in a room containing marijuana and associated paraphernalia. The First District, overruling the trial court, held that the entry violated the Fourth Amendment. It explained:
[The officer] admitted that prior to entering Eason's apartment he saw no evidence that the child had been, or was going to be, physically or mentally abused, saw no evidence that medical intervention was necessary, and saw no evidence of a murder or robbery. [He] also testified that, upon his arrival at the apartment complex, the child appeared to be in the care of a responsible adult. We must conclude, therefore, that the state did not satisfy its burden of proving that the officers had reasonable grounds to believe exigent circumstances existed....
Id. at 58-59.
Chief Judge Smith dissented. He argued that the majority should have focused on the safety of the child's mother, not the child himself. Id. at 59 (Smith, C.J., dissenting). According to the dissent, "this episode developed substantially beyond a mere `lost child' incident when the officers were led by the child to the partially open door and were told, `Mommy's in there.'" Id. at 61. Because the mother could have been suffering a medical emergency, Chief Judge Smith concluded that the officers "need[ed] to act" and that it would have been illogical for them to walk away from the scene. Id.
On appeal in this case, the Second District rejected the majority's reasoning in Eason and agreed with the dissent. See *278 Riggs, 890 So.2d at 467. The Second District explained that "[t]he officers believed it was their duty to see that the child's caregiver was not incapacitated and justifiably entered the residence." Id. The district court accepted that belief as reasonable under the circumstances. Id. at 467-68. It therefore reversed the trial court's order granting Riggs's motion to suppress. Id. at 468.
Riggs sought review in this Court based on express and direct conflict with Eason. Although the two decisions recite the same principles of Fourth Amendment law, we have jurisdiction because of the Second District's "application of a rule of law to produce a different result in a case which involves substantially the same facts as a prior case." Mancini v. State, 312 So.2d 732, 733 (Fla.1975) (citing Nielsen v. City of Sarasota, 117 So.2d 731 (Fla.1960)). We granted review, Riggs, 900 So.2d at 554, and now resolve the conflict by approving the district court's decision.

II. ANALYSIS
We must decide whether exigent circumstances justified the warrantless entry of Riggs's apartment. In determining that issue, we (A) explain the standard of review, (B) summarize the exigent circumstances doctrine, and (C) discuss medical emergencies in particular. Finally, in section (D), we apply the law to the facts of this case.

A. Standard of Review
When reviewing rulings on motions to suppress, we "accord a presumption of correctness ... to the trial court's determination of historical facts, but [we] independently review mixed questions of law and fact that ultimately determine constitutional issues." Fitzpatrick v. State, 900 So.2d 495, 510 (Fla.2005) (quoting Nelson v. State, 850 So.2d 514, 521 (Fla.2003) (quoting Connor v. State, 803 So.2d 598, 608 (Fla.2001))). In this case, the trial court granted the motion to suppress after determining one historical fact  that the unattended girl was "safe" when the deputies entered the apartment. That finding, which neither party disputes, is entitled to a presumption of correctness. The remainder of our review must be independent and therefore de novo.

B. The Warrant Requirement and the Exigent Circumstances Exception
The United States Supreme Court has repeatedly identified "physical entry of the home [as] the chief evil against which the wording of the Fourth Amendment is directed." Payton v. New York, 445 U.S. 573, 585, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) (quoting United States v. United States District Court, 407 U.S. 297, 313, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972)). Throughout the Supreme Court's caselaw, "the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." Id. at 590, 100 S.Ct. 1371. As the preceding sentence suggests, however, a well-established exception exists for "the sort of emergency or dangerous situation, described in our cases as `exigent circumstances,' that would justify a warrantless entry into a home for the purpose of either arrest or search." Id. at 583, 100 S.Ct. 1371.
When the government invokes this exception to support the warrantless entry of a home, it must rebut the presumption that such entries are unreasonable. See Welsh v. Wisconsin, 466 U.S. 740, 750, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984). To do so, it must demonstrate a "grave emergency" that "makes a warrantless search imperative to the safety of the police and of the community." Illinois v. Rodriguez, 497 U.S. 177, 191, 110 S.Ct. *279 2793, 111 L.Ed.2d 148 (1990). An entry is considered "imperative" when the government can show a "compelling need for official action and no time to secure a warrant." Michigan v. Tyler, 436 U.S. 499, 509, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978). As is often the case under the Fourth Amendment, "[t]he reasonableness of an entry by the police upon private property is measured by the totality of existing circumstances." Zeigler v. State, 402 So.2d 365, 371 (Fla.1981).
The circumstances in which the Supreme Court has applied the exigent circumstances exception are "few in number and carefully delineated." U.S. District Court, 407 U.S. at 318, 92 S.Ct. 2125. They include pursuing a fleeing felon, Warden v. Hayden, 387 U.S. 294, 298-99, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967), preventing the destruction of evidence, Schmerber v. California, 384 U.S. 757, 770-71, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), searching incident to a lawful arrest, Chimel v. California, 395 U.S. 752, 762-63, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), and fighting fires, Tyler, 436 U.S. at 509, 98 S.Ct. 1942. Outside of those established categories, the Supreme Court "has often heard, and steadfastly rejected, the invitation to carve out further exceptions to the warrant requirement for searches of the home." Rodriguez, 497 U.S. at 192, 110 S.Ct. 2793.
In applying the exigent circumstances exception, we have explained its general parameters:
The kinds of exigencies or emergencies that may support a warrantless entry include those related to the safety of persons or property, as well as the safety of police. Of course, a key ingredient of the exigency requirement is that the police lack time to secure a search warrant.... Moreover, an entry based on an exigency must be limited in scope to its purpose. Thus, an officer may not continue her search once she has determined that no exigency exists.
Rolling v. State, 695 So.2d 278, 293 (Fla. 1997) (citations omitted). In other words, where safety is threatened and time is of the essence, we have recognized that "the need to protect life and to prevent serious bodily injury provides justification for an otherwise invalid entry." Arango v. State, 411 So.2d 172, 174 (Fla.1982).

C. Medical Emergencies in Particular
This case involves a particular kind of exigent circumstance  a feared medical emergency. The United States Supreme Court has not expressly ruled on this issue. However, it has twice discussed medical emergencies in dicta. The first discussion appeared in Mincey v. Arizona, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978):
We do not question the right of the police to respond to emergency situations. Numerous state and federal cases have recognized that the Fourth Amendment does not bar police officers from making warrantless entries when they reasonably believe that a person within is in need of immediate aid.... "The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency."
Id. at 392, 98 S.Ct. 2408 (quoting Wayne v. United States, 318 F.2d 205, 212 (D.C.Cir. 1963)) (footnotes omitted).
The second discussion appeared in Thompson v. Louisiana, 469 U.S. 17, 105 S.Ct. 409, 83 L.Ed.2d 246 (1984), which essentially reinforced Mincey. In Thompson, a woman shot her husband, attempted suicide by overdosing on pills, and then, changing her mind, called her daughter for help. The daughter contacted the police, who entered the unconscious mother's *280 house, transported her to the hospital, and later searched the house for two hours. Id. at 18-19, 105 S.Ct. 409. Although the Supreme Court did not uphold the two-hour search, it acknowledged that the mother's medical emergency "would have justified the authorities in seizing evidence under the plain-view doctrine while they were in the [mother's] house to offer her assistance." Id. at 22, 105 S.Ct. 409.[1]
Mincey and Thompson confirmed what we recognized in Hornblower v. State, 351 So.2d 716 (Fla.1977): that "the `emergency exception' permits police to enter and investigate private premises to preserve life ... or render first aid, provided they do not enter with an accompanying intent either to arrest or search." Id. at 718. As other courts have explained, and we have reiterated, this authority "is inherent in the very nature of their duties as peace officers and derives from the common law." Zeigler, 402 So.2d at 371; see also United States v. Barone, 330 F.2d 543, 545 (2d Cir.1964) (containing the same assertion). It is built into the Fourth Amendment's concept of reasonableness.
Unlike the United States Supreme Court, we have addressed this issue several times and have upheld warrantless entries motivated by feared medical emergencies. Three cases stand out. In the first, we upheld a warrantless entry where the police tried to identify a chemical that had apparently poisoned seven children then in critical condition. Richardson v. State, 247 So.2d 296, 297-98 (Fla.1971). We emphasized that the "searches of the premises were made for the purpose of aiding doctors to save the children's lives and before defendant became [a] suspect." Id. at 298.
In the second case, we upheld a warrantless entry to prevent a feared suicide attempt. Turner v. State, 645 So.2d 444 (Fla.1994). The defendant opened the door of his motel room to police and, leaving it ajar, walked back to his bed. He then pulled a gun and pointed it at his head. Confirming that "officers can make warrantless entries if they reasonably believe a person inside has immediate need," we held that "[t]his was such an emergency, so the officers did not err in entering Turner's motel room. And, once legally inside the room, police could seize evidence in plain view." Id. at 447.
In the third case, we held that defense counsel in a death-penalty trial was not deficient in failing to move to suppress evidence based on a warrantless entry into the defendant's home. See Zakrzewski v. State, 866 So.2d 688, 693-95 (Fla.2003). The police had received reports that the defendant failed to attend an Air Force class, that his home had a broken window, and that his mail was accumulating. An officer entered the defendant's home through the broken window because he "feared for the welfare of whomever may have been in the house at that time." Id. at 695 (quoting officer's testimony). We agreed that a motion to suppress would have been futile because the officer "did not enter [the defendant's] home with the *281 intent to seize evidence or make an arrest." Id.
In all three cases, when the police entered the dwelling they suspected some kind of medical emergency. In Richardson, they did not know if they would find the unidentified poison. In Turner, they did not know if the defendant actually intended to kill himself. In Zakrzewski, they did not know why the defendant was missing. We deemed each entry reasonable. Our decisions therefore confirm that authorities may enter a private dwelling based on a reasonable fear of a medical emergency. In those limited circumstances, the sanctity of human life becomes more important than the sanctity of the home.
We have not yet considered, however, a case involving a child lost in a housing complex. Nor have most other states. The only jurisdiction with closely analogous cases appears to be California. The leading case there is People v. Smith, 7 Cal.3d 282, 101 Cal.Rptr. 893, 496 P.2d 1261 (1972). In Smith, the police were summoned when a six-year-old girl was found crying outside her apartment at 5 p.m. Although the girl informed the officer that her mother was not inside the apartment, the officer knocked on the door "to find out if [the mother] was there, if she could take care of her daughter, and if she may need any help." Id. at 1263. Receiving no answer, the officer entered without a warrant and found marijuana in plain view. The California Supreme Court affirmed suppression of the evidence. It explained that "a six-year-old girl is obviously competent to state whether her mother is at home or not." Id. Further, the court determined that "[t]here was not a scintilla of evidence to support the assumption that [the mother] had not only returned unnoticed to her flat but had thereupon suddenly fainted, fallen sick, or otherwise become incapacitated." Id. at 1264. Thus, "the belief upon which the officer acted was the product not of facts known to or observed by him, but of his fanciful attempt to rationalize silence into a justification for his warrantless entry." Id.
The circumstances in Smith differed from those here in four respects: here the unattended girl (1) was two years younger; (2) was naked; (3) was found in the middle of the night; and (4) was totally disoriented, never stating or even implying where her caretaker was. California's intermediate appellate courts have distinguished Smith based on such differences. See, e.g., People v. Miller, 69 Cal.App.4th 190, 81 Cal.Rptr.2d 410, 415 n. 4 (1999) (distinguishing Smith because "[t]here, the child was six years old and she specifically told the officer that her mother was not home," whereas the child in Miller was two years old and dressed in a diaper); In re Dawn O., 58 Cal.App.3d 160, 128 Cal. Rptr. 852, 854 (1976) (upholding a similar entry that occurred at 10:30 p.m. because "[t]he lateness of the hour makes any concern... about the presence of [the child's] parents . . . much more reasonable than might be in the case of an entry at 5:00 p.m."). Thus, we do not find Smith sufficiently analogous to be helpful.

D. Applying the Law to this Case
We must decide whether the deputies in this case acted reasonably in entering Riggs's apartment without a warrant because they feared that the unattended girl's caretaker might need medical attention. The girl was four years old, naked, and wandering through the apartment complex at 3 a.m. on a January night. She was disoriented. The deputies were never told that she came from Riggs's apartment. Rather, while knocking on doors one-by-one, they noticed that his apartment was the only one on the second floor *282 whose door was open. They also noticed light coming from inside. After receiving no response to three dozen loud knocks, which brought some of the neighbors outside, they entered the apartment.
Riggs contends that the deputies acted unreasonably. He asserts, first, that the deputies lacked a sufficient objective basis for fearing a medical emergency; and second, that they lacked a sufficient objective basis for connecting any emergency with his apartment. We address each argument in turn.
The first question is whether the deputies had reasonable grounds to believe that the girl's caretaker might need medical attention. We conclude that they had sufficient empirical evidence to support their belief. First, the girl was only four years old. See Miller, 81 Cal.Rptr.2d at 415 n. 4 (emphasizing the age of the child as an objective factor indicating an emergency). Second, she was alone outside in the middle of the night in January. See Dawn O., 128 Cal.Rptr. at 854 (emphasizing "the lateness of the hour"). Third, she was not wearing any clothes. See Miller, 81 Cal.Rptr.2d at 415 (emphasizing that the child was "wearing only a diaper"). Together, these facts seem to indicate either grossly negligent supervision or an emergency involving the child's caretaker.
The second question is whether the deputies had reasonable grounds to connect the feared emergency to the apartment they entered. We acknowledge that the deputies were uncertain that the girl came from Riggs's apartment. Unlike the situation in Eason, where the young boy led the police to a particular apartment and said, "Mommy's in there," 546 So.2d at 58, the girl in this case did not lead the deputies in any particular direction. A search based on a feared medical emergency, however, does not require certainty. The Fourth Amendment, which protects against unreasonable searches, requires only that the police reasonably believe that an emergency exists.
Here, strong circumstantial evidence pointed to Riggs's apartment. The officers found the girl close to an apartment complex, through which she had been wandering. They logically turned their attention to the complex, commencing a door-to-door search. They were drawn to Riggs's apartment because it was 3 a.m. and his was the only apartment on that floor with an open door. Light emanated from the apartment, indicating occupancy. Yet the deputies received no response to three dozen knocks, which were loud enough to bring neighbors out of their apartments. This is precisely the cluster of clues that one would expect to find in the event a caretaker had become incapacitated and a young child had wandered off. The deputies' suspicion of a medical emergency therefore was based on reasonable inferences drawn from the available evidence.
We cannot accept Riggs's argument that the deputies should have simply walked away from his open door, or that they should have searched the rest of the complex for other open doors before entering his apartment. Given their reasonable fear of a medical emergency, the deputies did not have time to retreat and weigh their options. As the First Circuit recently explained, officers fearing emergencies often "need [to make] an on-the-spot judgment based on incomplete information and sometimes ambiguous facts bearing upon the potential for serious consequences." See United States v. Martins, 413 F.3d 139, 147 (1st Cir.2005), cert. denied, ___ U.S. ___, 126 S.Ct. 644, 163 L.Ed.2d 520 (2005). The deputies in this case made precisely such a judgment. The resulting invasion of privacy is one that prudent, law-abiding citizens can accept as the fair *283 and necessary price of having the police available as a safety net in emergencies.

III. CONCLUSION
We conclude that, in entering Riggs's apartment without a warrant, the deputies acted reasonably and consistent with the Fourth Amendment. We therefore approve the Second District's decision to reverse the trial court's suppression of the evidence and to remand the case for further proceedings. We disapprove the First District's conflicting decision in Eason.
It is so ordered.
PARIENTE, C.J., and WELLS, ANSTEAD, LEWIS, QUINCE, and BELL, JJ., concur.
NOTES
[1] Some courts also cite Cady v. Dombrowski, 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973), as supporting a medical emergency exception. Cady upheld a warrantless inventory search of an automobile, deeming it one of a police agency's "community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." Id. at 441, 93 S.Ct. 2523. We do not rely on Cady, however, because the Court's analysis was expressly limited to the automobile context. See id. at 442, 93 S.Ct. 2523 (noting a "constitutional difference between searches of and seizures from houses and similar structures and from vehicles").